IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELLIOT WOLFF, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:06 CV 01234 (HHK) |
| | ) | |
| WESTWOOD MANAGEMENT LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| ‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒ | ) | |

## MOTION TO COMPEL ARBITRATION

Defendants, LNT&A Master, LLC; Laszlo N. Tauber & Associates I, LLC; Laszlo N. Tauber & Associates II, LLC ; Laszlo N. Tauber & Associates VI, LLC; Laszlo N. Tauber M.D. & Associates, LLC; The Laszlo N. Tauber Revocable Trust; Investor's Holding Corporation; Westwood Management, LLC; Westwood Construction Company, Inc.; and John Droke, in accordance with 9 U.S.C. § 4, the Federal Arbitration Act, respectfully request this Court enter an order compelling arbitration of the disputes raised in Plaintiffs' Complaint. In support of their Motion, Defendants submit the accompanying Memorandum of Law.

Respectfully submitted,

HOLLAND & KNIGHT, LLP

_____

Paul J. Kiernan (DC Bar # 385627)
Rafael E. Alfonzo (DC Bar # 478524)
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 663-7276
(202) 955-5564 ‒ fax

# 4040981_v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIOT WOLFF, et al.                         )
                                             )
              Plaintiffs,                    )
                                             )
       v.                                    )        1:06 CV 01234 (HHK)
                                             )
WESTWOOD MANAGEMENT LLC, et al.              )
                                             )
              Defendants.                    )
_____     )

## MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION

Defendants, LNT&A Master, LLC; Laszlo N. Tauber & Associates I, LLC; Laszlo N. Tauber & Associates II, LLC; Laszlo N. Tauber & Associates VI, LLC; Laszlo N. Tauber M.D. & Associates, LLC; The Laszlo N. Tauber Revocable Trust; Investor's Holding Corporation; Westwood Management, LLC; Westwood Construction Company, Inc.; and John Droke, submit this Memorandum in support of their Motion to Compel Arbitration.

### SUMMARY OF ARGUMENT

This commercial real estate case involves disputes brought by Plaintiffs, who were originally members of an entity called District of Columbia Joint Venture ("DCJV"). That entity was governed by a written agreement containing a clause requiring arbitration of any disputes. Assuming, only for the sake of this Motion, the correctness of the Plaintiffs' allegations, it is clear that their claims are ones that are governed by the DCJV arbitration clause. Moreover, the successor entities to DCJV, including the ultimate entity known as LNT&A Master, LLC ("LNT&A Master"), were subject to succeeding agreements that also contained arbitration provisions. So, even if Plaintiffs contended that their claims should be governed by any subsequent agreement, those claims would still be subject to arbitration.

The disputes Plaintiffs raise are intended to be resolved in arbitration, not in court, and Defendants request that the Plaintiffs be compelled to arbitrate.

## BACKGROUND[1]

On May 18, 1971, Egon Wolff purchased a small share of the DCJV, a real estate partnership venture created by Dr. Laszlo N. Tauber. (Complaint ¶¶ 17, 19). The purpose of the DCJV was to own and develop a parcel of land in the District of Columbia located at 2100 2nd Street, S.W., Washington, D.C. (Complaint ¶¶ 4, 17). According to the DCJV partnership agreement that he executed, Mr. Wolff obtained an "ownership interest [of] 0.5% in the land and 0.25% in the building," for the sum of $20,000 (Twenty Thousand Dollars). (Complaint ¶ 19 and DCJV partnership agreement ¶ 17, attached as Exhibit 1).[2]

The DCJV partnership agreement provided for arbitration of any disputes:

> The parties agree not to enter into any court action in any dispute which may arise during construction and management of the office building complex and agree that *any dispute or controversy that cannot be amicably settled will be submitted to arbitration*;

(Exhibit 1 ¶ 15) (emphasis added).

The DCJV partnership agreement also made it clear that Dr. Tauber was to have control over the business and direction of the DCJV and that the other minority investors, like Mr. Wolff, would be mere passive partners entitled only to a share of any profits:

> Dr. Tauber will be in charge of all construction activities, leasing, mortgaging and selling and other dealings with such land and proposed construction, if any. Dr. Tauber shall have the right to buy any equipment on conditional bill on sale and shall have the further right to sign any and all documents in connection with this venture. *You will have no voice in the construction or management as you will be an investor only.* (Exhibit 1 ¶ 5) (emphasis added)

---

[1] For purposes of this motion, the background facts alleged by the Plaintiffs will be assumed to be true.

[2] *Vanover v. Hantman*, 77 F.Supp.2d 91, 98 (D.D.C.1999) ( "where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.") (*citing Greenberg v. The Life Ins. Co. of Virginia*, 177 F.3d 507, 515 (6th Cir.1999)).

\*                          \*                          \*

It is understood by Dr. Tauber in the development of the land required, the construction activities, if any, and the obtaining of construction money and permanent mortgages required by the joint venture, that *Dr. Tauber will be in charge of such activities and all decisions relating to such activities shall be made by him*. (Exhibit 1 ¶ 9) (emphasis added)

\*                          \*                          \*

No purchaser of property from Dr. Tauber, nor any lender of money upon the security of any of the joint venture assets, shall be required to see to his authority to make a conveyance or obtain a loan upon the security of the property, or to see to his application of any purchase money or money loaned. *Each purchaser or lender shall be entitled to deal with him with respect to said property to all intents and purposes as though he was the actual owner thereof*. (Exhibit 1 ¶ 10) (emphasis added)

\*                          \*                          \*

*Any major decisions necessary or desirable in carrying out this joint venture, and for the determination of which no provision herein is made, shall be made by Dr. Tauber*.

(Exhibit 1 ¶ 12) (emphasis added).

Dr. Tauber successfully developed the DCJV parcel into what is now known as the Transpoint Building. (Complaint ¶ 4). Later, Dr. Tauber added a half-acre parcel of land adjacent to the Transpoint Building to the holdings of the DCJV, identified in the Complaint as the "Adjacent Lot." (Complaint ¶ 18).

Mr. Wolff died in November 1984, and his interest passed to his son, Elliot Wolff, and to the Wolff Trust, the Plaintiffs in this action. (Complaint ¶ 22).

On December 6, 1984, Dr. Tauber sought to merge the DCJV with a number of other similarly-organized real estate partnerships that he controlled into Laszlo N. Tauber M.D. &

3

Associates ("LNT&A Partnership").[3]  (Complaint ¶ 23).  Dr. Tauber was authorized to do this by

the DCJV partnership agreement (and other similar partnership agreements).  (Exhibit 1 ¶¶ 5, 9-

10, 12).  Dr. Tauber explained to his partners in the various partnerships that the merger would

enable him and his successors to more easily manage the properties of the various partnerships.

(Letter by Dr. Tauber dated December 6, 1984, and attached as Exhibit 2).  Dr. Tauber further

explained that a consolidation of all the partnership properties into a single portfolio would more

easily allow for a sale or merger with a larger company.  *Id*.

Subsequently, in 1998, Dr. Tauber reorganized LNT&A Partnership into several LLCs in

order to limit the liability of the partnership interests.  The principal LLC was LNT&A Master,

which wholly owned a number of subsidiary LLCs, which in turn owned the various properties

previously held by LNT&A Partnership.  The Transpoint Building and the Adjacent Lot were

placed into the Laszlo N. Tauber & Associates I, LLC ("Tauber I, LLC") subsidiary.  (Complaint

¶ 27).  Thus, the Plaintiffs' interest in LNT&A Partnership was transferred into LNT&A Master

and the previously-related properties were held by Tauber I, LLC.

The LNT&A Master operating agreement (like previous agreements related to the

underlying real estate investments) contains an arbitration provision ("LNT&A arbitration

provision"), which currently reads in part:

> Any dispute, controversy or claim arising out of or relating to this Agreement
> including, but not limited to: (i) any claim for payment of a greater share of the
> income, profits, or proceeds of the LLC; (ii) any claim relating to payment of a
> greater share of the income, profits, or proceeds of the predecessors of the LLC
> whose assets and liabilities were acquired by the LLC, including Laszlo N.

---

[3] Paragraph 12 of the LNT&A Partnership agreement also contained an arbitration provision:

> The parties agree hereto not to institute any court action in connection with any dispute
> which may arise relative to this Partnership and agree that any dispute or controversy that
> cannot amicably be settled shall be submitted to binding arbitration pursuant to the rules
> of the American Arbitration Association.  Any such arbitration shall be held in the State
> of Maryland.

4

> Tauber M.D. & Associates, and/or its predecessor joint ventures; ... shall be finally settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect ....

(Fourth Amendment to LNT&A Master Operating Agreement ¶ 9.8, attached as Exhibit 3).

On July 28, 2002, Dr. Tauber died, and Westwood Management, LLC, became (and continues to be) the Managing Member of LNT&A Master in accordance with a vote of more than 75% of the membership interests in LNT&A Master.

Plaintiffs have filed suit alleging that in connection with the management, financing, and ultimate disposition of both the Transpoint Building and the Adjacent Lot, the Defendants breached duties owed to them. Among other things, Plaintiffs allege that various Tauber entities and their agents undertook improper financing on the properties in 1973, 1987, 1993, and 1999 (Complaint ¶ 28); that monies generated through the properties and the management of the properties were diverted to unauthorized uses (Complaint ¶ 37); and that the properties were ultimately sold for less than their proper value and the proceeds improperly allocated. (Complaint ¶¶ 42, 47, 54).

Rather than pursue their claims in arbitration as required by the DCJV partnership agreement, as well as the LNT&A Master operating agreement, Plaintiffs filed the instant action. Defendants notified Plaintiffs of their obligation to arbitrate their claims, but Plaintiffs have refused and insisted on pursuing their claims in this Court.

## ARGUMENT

### I.    Legal Standard for a Motion to Compel Arbitration.

The Federal Arbitration Act ("FAA") provides that "a written provision in ... a contract to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable save upon any grounds as exist at law or in equity for the revocation

of any contract." 9 U.S.C. § 2. Courts have long interpreted the FAA to create a strong presumption in favor of enforcing arbitration agreements and "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987) (stating that arbitration agreements must be rigorously enforced); *Brown v. Wheat First Securities, Inc.*, 257 F.3d 821, 825 (D.C.Cir.2001), cert. denied, 534 U.S. 1067 (2001) ("By enacting the FAA, Congress 'manifest[ed] a liberal federal policy favoring arbitration of agreements.").

Under the FAA, "[t]here is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted disputes. Doubts should be resolved in favor of coverage.'" *Jung v. Ass'n of Am. Med. Colls.*, 300 F.Supp.2d 119, 144-45 (D.D.C.2004) (quoting *AT & T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *see also Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989) (stating that "ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration").

A motion to compel arbitration is properly reviewed under the summary judgment standard of Rule 56(c). *See Hughes v. CACI, Inc.*, 384 F.Supp.2d 89, 92-93 (D.D.C.2005) ("'inasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate[,]' consideration of the motion according to the 'standard used by district courts in resolving summary judgment motions pursuant to Fed.R.Civ.P. 56(c) … is appropriate.'") (quoting *Par-*

6

*Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n. 9 (3d Cir.1980); *also citing*

*Nelson v. Insignia/Esg, Inc.*, 215 F.Supp.2d 143, 147 (D .D.C.2002); *Lok Tio v. Wash. Hosp.*

*Center*, 2004 WL 2663149, at *2-3 (D.D.C.2004)).

## II.    The Arbitration Clause Contained in the DCJV Partnership Agreement Should Be Enforced.

To enforce an arbitration provision, Section 4 of the FAA permits a party to petition the

district court "for an order directing that such arbitration proceed in the manner provided for in

such agreement." 9 U.S.C. § 4.  When presented with a motion to compel arbitration, a district

court must "determine the enforceability of the agreement [to arbitrate] and decide whether

arbitration should be compelled." *Nelson v. Insignia/ESG, Inc.*, 215 F.Supp.2d 143, 146

(D.D.C.2002).  It is well-settled law that to make such a determination, courts must engage in a

two-part inquiry. *Id.* at 149-50.  First, the court must decide whether the parties entered into a

valid and enforceable arbitration agreement. *See Nur v. K.F.C. USA, Inc.*, 142 F.Supp.2d 48, 50-

51 (D.D.C.2001).   Second, if the court finds that the parties did enter a valid arbitration

agreement, the court must determine whether the arbitration agreement encompasses the claims

raised in the complaint. *Id.*  Each prong of this test is discussed below.

The Supreme Court has instructed that "[w]hen deciding whether the parties agreed to

arbitrate a certain matter, … courts generally … should apply ordinary state law principles that

govern the formation of contracts." *First Opinions of Chicago, Inc., v. Kaplan*, 514 U.S. 938,

944 (1995).

Here, Plaintiffs have sued to enforce rights they claim have been violated arising out of

the DCJV partnership agreement.  There is no dispute about the existence of the arbitration

clause in that agreement.  Giving that clause its fair and broad reading, it reflects the Plaintiffs'

agreement to arbitrate any disputes.  There is also no genuine dispute that the claims which the

7

Plaintiffs assert are disputes encompassed by that agreement as the claims are directly premised on alleged rights and obligations concerning financing the properties, use of funds, and ultimately disposition of the assets. Even if the clause were given a narrow reading as to what constitutes "management" of the building, it would have to include financing and disposition of the property.

Moreover, because Plaintiffs have sued an array of people and entities associated with the DCJV and the Tauber entities, it should be noted that courts have held that persons bound by an arbitration agreement can be compelled to arbitrate their claims with a non-signatory where "a careful review of 'the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them discloses that 'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Industries v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)); *see also Contec Corp v. Remote Solution, Co.*, 398 F.3d 205, 209 (2d Cir. 2005) ("A useful benchmark for relational sufficiency can be found in our estoppel decision in *Choctaw* . . . where we held that the signatory to an arbitration agreement is estopped from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.")

Plaintiffs have alleged that the Defendants acted in concert to breach fiduciary and contract duties owed to them stemming from the DCJV partnership agreement. Resolution of the allegations will require consideration of the roles of all of the Defendants, including Defendant entities and agents that were not parties to the original DCJV partnership agreement. *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) ("Application of

8

equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.") (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)).

Finally, All defendants confirm their willingness to arbitrate the dispute. Therefore, there is no contractual or legal impediment to the arbitration of the entire dispute.

**III.    Even if the DCJV Partnership Agreement Did Not Apply, the Disputes Plaintiffs Raise Are Still Arbitrable.**

In their Complaint, Plaintiffs acknowledge that their original interest in the DCJV has changed over the years. They purport to be bringing a derivative claim on behalf of Laszlo N. Tauber & Associates I, LLC, one of the successor entities to the DCJV. (Complaint ¶¶ 51-52, 58-59). Indeed, Plaintiffs submitted a sworn verification that they were "members and/or beneficial owners of the DCJV *and its successors* at the time of the transactions at issue in the Complaint." (Verification Related to Derivative Claims at ¶ 1) (emphasis added). Plaintiffs' claim hinges, ultimately, on their status as members of the entities that controlled the Transpoint Building and the Adjacent Lot through the years and until their sale following Dr. Tauber's death. Defendants submit that these claims are governed by the succeeding written contracts and their arbitration agreements.

The FAA does not require proof that the individual plaintiffs signed the arbitration agreement. Rather, a party can be bound to an arbitration agreement even when it did not physically sign the contract. *See Imptex International Corp. v. Lorprint, Inc.*, 625 F.Supp. 1572 (S.D.N.Y. 1986) (arbitration clause in an unsigned printed form contract enforceable; signature is not a requirement for a valid arbitration agreement and it is "sufficient that the parties by act or conduct are committed to it"). The key under the Act is that the arbitration clause be part of a

9

written contract.  Here, there was an arbitration agreement in the original DCJV partnership agreement, and there is one in the current LNT&A Master LLC operating agreement.

The Plaintiffs challenge their participation in LNT&A Master (and its preceding entities) despite that both parties have adhered to the terms of the current operating agreement for almost eight years, to the terms of the LNT&A entities for over twenty years, and to Dr. Tauber's terms for nearly thirty-five years.  Plaintiffs have consented to and benefited from the management of their real estate interests and have seen their investment grow and have accepted payments from Defendants calculated based on the LNT&A Master operating agreement that they now challenge.  While Plaintiffs are now challenging the nature and extent of Plaintiffs' stake resulting from the initial investment in the DCJV, both sides can agree that Plaintiffs and certain of the Defendants maintained an investor-investment manager relationship throughout the period in question.  This relationship has principally been governed by agreements that included an arbitration provision.

On a motion to compel arbitration, the court does not engage in an analysis of the merits of the underlying dispute.  But, it is clear, even at this stage, that Plaintiffs entered into an agreement whereby Dr. Tauber was accorded substantial authority in the management of the DCJV, its borrowings, its contracts, and ultimately its disposition.  Having tied their fortunes – and made a fortune – to Dr. Tauber and the succeeding entities, the Plaintiffs cannot now disavow the contracts governing the relationship.

The Supreme Court has held that "as a matter of substantive federal arbitration law, an arbitration clause is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, __ U.S. __, 126 S. Ct. 1204, 1210 (2006) citing *Southland Corp. v. Keating*, 456 U.S. 1, 4-5 (1984) and *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402

(1967). Therefore, "unless a challenge is brought to the arbitration clause itself, the issue of a contract's validity is considered by the arbitrator in the first instance." *Id*. This rule applies whether the challenge to a contract's validity is brought in state or federal court. *See Buckeye Check Cashing*, 126 S. Ct. at 1210.

Here, the Plaintiffs are suing to enforce rights they claim to have arising out of the DCJV and obviously cannot and have not challenged that agreement. They have not stated a basis for challenging the enforceability of the arbitration clause in the DCJV partnership agreement or for following that clause's application into subsequent disputes involving other entities.

## CONCLUSION

It is well established that a court may dismiss an action altogether where "all issues raised in the complaint must be submitted to arbitration." *Emeronye v. CACI Int'l, Inc.*, 141 F.Supp.2d 82, 88 (D.D.C.2001); *see also Cole v. Burns Int'l Sec. Servs.*, 1996 U.S. Dist. LEXIS 22541 at 11-12 (D.D.C. Jan. 31, 1996), *aff'd*, 105 F.3d 1465 (D.C.Cir.1997). In this case, all of Plaintiff's claims must be submitted to arbitration, since the arbitration clause squarely applies to each of the disputes Plaintiffs raise in their Complaint.

For the foregoing reasons, Defendants respectfully request that this Court enter an Order dismissing this case and compelling their claims be raised at arbitration.

Respectfully submitted,

HOLLAND & KNIGHT, LLP

Paul J. Kiernan (DC Bar # 385627)
Rafael E. Alfonzo (DC Bar # 478524)
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
(202) 663-7276
(202) 955-5564 – fax

11

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of Defendants' Motion to Compel Arbitration and the accompanying Memorandum was served by electronic mail on counsel for Plaintiff, Les Alderman, Esq., lalderman@a-dlaw.com , on September 12, 2006.

Rafael Alfonzo

# 4020246_v4