**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ELLIOT WOLFF, et al.** | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Civil Action 1:06 CV 01234 (HHK)** |
| | ) | |
| **WESTWOOD MANAGEMENT LLC,** | ) | |
| **et al.** | ) | |
| **Defendants** | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION**

As a result of Defendants' cloudy financial transactions, mind-boggling use of the corporate shell game and refusal to permit the Plaintiffs to inspect all relevant financial records, it is difficult (at a minimum), without the opportunity to conduct discovery, to clearly identify the details of, and the parties to, each transaction that has occurred with regard to the property formerly owned by the District of Columbia Joint Venture (DCJV), namely the Transpoint Building and the Adjacent Lot (the "subject properties").

The Defendants, however, facilitate the Plaintiffs' effort to demonstrate that arbitration is not mandated in this civil action because, contrary to their obligations to adhere to the standard for summary judgment under Fed. R. Civ. Pro. 56(c) (*infra*), the Defendants have merely incanted the word arbitration, apparently banking on the well-established presumption in favor of arbitration to carry the day.  As such, the Defendants have failed to demonstrate that there are no genuine issues as to any material fact with regard to the existence of an enforceable arbitration agreement that applies to all parties and to all claims the Plaintiffs have asserted in their complaint.

The Plaintiffs, by and through their undersigned counsel, hereby begin the process of shining the light on the Defendants' business practices and offer the following in Opposition to the Defendants' Motion to Compel Arbitration,

**PLAINTIFFS' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT**

1) In 1971, the Plaintiffs entered into the District of Columbia Joint Venture (DCJV), which gave them ownership interest in the Transpoint Building and, at some time thereafter, the Adjacent Lot. See Exhibit 1 (1971 Agreement).

2) In December 1984, Dr. Tauber, as trustee of the DCJV, indicated his intention to "merge all the partnerships [including the DCJV] into a single [but unnamed[1]] partnership." Exhibit 2 (Dec. 6, 1984 letter, p. 2, ¶ 2). In accordance with the letter, the merger became effective January 1, 1985. *Id.* ¶ 3.    Thereafter, according to the Defendants, the DCJV ceased to exist.

3) Instead of converting the Plaintiffs' interest in the DCJV into one of the options provided in the December 6, 1984 letter, Dr. Tauber agreed to "put [the Plaintiffs'] interest in trust" (Exhibit 2 (Dec. 6, 1984 letter, p. 6, ¶ 5)).  Complaint, ¶ 24.

4) A January 14, 1994 letter from "Laszlo N. Tauber, M.D. and Associates, a Joint Venture Partnership" announced an offer to roll members of the "single

---

[1] In their Memorandum in Support of the Motion to Compel Arbitration (Def's Memorandum), the Defendants refer to this grouping of joint ventures as "Laszlo N. Tauber M.D. & Associates" and nicknames the entity "LNT&A Partnership." *See* Def's Memorandum in Support at 3-4.  The Defendants, however, provide no evidence of the actual existence of any entity with either of these names (either "Laszlo N. Tauber M.D. & Associates" or "LNT&A Partnership"). *See* Def's Memorandum at 3-4.    The Defendants additionally claim that the LNT&A Partnership agreement contained an arbitration agreement, but they have failed to provide that agreement as an exhibit so that the provision and its applicability may be examined for the purpose of this motion.

partnership" created in the December 1984 letter into a Real Estate Investment Trust. Exhibit 3, January 14, 1994 letter.

5) In the January 14, 1994 letter, Dr. Tauber advised those Partners who chose option "B" under the December 1984 letter[2] that they were "basically not a partner but an owner of a debenture." The unilateral action of converting certain partners to debenture holders surely evidences Dr. Tauber's intent that the DCJV and all rights contained therein were extinguished as of January 1, 1985 (the effective date of the merger into the "single partnership").

6) The "single partnership's" assets were apparently never rolled into the Real Estate Investment Trust. See Complaint, ¶ 26.

7) In a January 2, 1999 deed (Exhibit 4) filed with the District of Columbia, Dr. Tauber conveyed all property owned by the District of Columbia Joint Venture, including the Transpoint Building and Adjacent Lot, to Tauber I.

8) In the above-referenced January 2, 1999 deed (Exhibit 4), whereby the DCJV conveyed the Transpoint Building and Adjacent Lot to Tauber I, Dr. Tauber asserted that "the general partners of the Grantor [DCJV] are the identical and only members of the Grantee [Tauber I]."[3] (emphasis added).

---

[2] Plaintiffs were not "B" partners because they chose instead to have their original ownership interest in the DCJV held in trust.

[3] The Defendants claim at page 4, ¶ 2 of their Memorandum that: "[I]n 1998, Dr. Tauber reorganized LNT&A Partnership into several LLCs … The principal LLC was LNT&A Master, which wholly owned a number of subsidiary LLCs, which in turn owned the various properties previously held by LNT&A Partnership." (emphasis added). The Defendant has provided no documentation or other evidence to demonstrate that LNT&A Master LLC was the sole member of both the District of Columbia Joint Venture and Tauber I at the time the DCJV was transferred to Tauber I under the January 2, 1999 deed. It seems highly improbable that this would be the case, considering the number of investors in these LLCs.

9) Contrary to the December 6, 1984 letter (Exhibit 2) informing the investors of the former DCJV that all properties were being transferred to a single partnership, the 1999 deed demonstrates that the DCJV remained in existence and continued to hold title to the Transpoint Building and Adjacent Lot.

10) Confirming the January 2, 1999 deed (Exhibit 5), a December 4, 2002 letter from Defendant Westwood Management Corporation (now known as Investor's Holding Corporation)[4] indicated that the Transpoint Building and Adjacent Lot had been "grouped" into Laszlo N. Tauber & Associates I, LLC as of January 1999.  Exhibit 5, Dec. 4, 2002 letter, p. 2.

11) Dr. Tauber died on July 28, 2002. Def's Memorandum at 5. According to the 1984 letter (Exhibit 2), management and control of any of the Joint Ventures that had been transferred into the "single partnership" was to be vested in Westwood Management Corporation.

12) Contrary to the Defendants' assertion that LNT&A Master LLC wholly owned Tauber I or controlled its operations (Def's Memorandum at 4), Tauber I sold the Transpoint Building to TBC Funding Group on January 29, 2004, with no apparent participation by LNT&A Master LLC.  In fact, John C. Droke, on behalf of Westwood Management LLC, holding itself out as the Managing Member of Tauber I, executed the conveyance of the Transpoint Building.  *See* Exhibit 6 (January 29, 2004, Special Warranty Deed).

---

[4] According to the December 6, 1984 letter from Dr. Tauber (Exhibit 2), after his death the business of the various joint ventures that he had formed was to be conducted by the Westwood Management Corporation.  Exhibit 2, ¶ 3.

13) Likewise, contrary to the Defendants' assertion that LNT&A Master LLC wholly owned Tauber I or controlled its operations, Tauber I conveyed the Adjacent Lot to Laszlo N. Tauber & Associates LLC VI (Tauber VI) by special warranty deed on November 4, 2004 (for no apparent consideration). Again, John C. Droke executed the deed, on behalf of Westwood Management LLC, which purported to be the Managing Member of Tauber I. *See* Exhibit 7, November 4, 2004, Special Warranty Deed.

14) While the Adjacent Lot was ultimately conveyed, on December 15, 2004 from Tauber VI[5] to Buzzards Point, LLC (Exhibit 8, December 15, 2004 Special Warranty Deed), Westwood Management LLC communicated, in the memorandum that accompanied the disbursement of the proceeds of the sale to the Plaintiffs (Exhibit 9, April 27, 2005 Memorandum), that it was <u>Tauber I and not Tauber VI</u> that had sold "it's [*sic*] last remaining land interested associated with the Transpoint Building."[6]

15) On or about February 25, 2004, Defendant Droke, and/or Westwood Management LLC (the purported managing member of Tauber I, *supra*) and/or IHC improperly distributed the proceeds of the Transpoint Building so as to disproportionately advantage (in the extreme) the owners of the building as compared to the owners of the land (Exhibit 10, February 25, 2004 Memorandum from Droke to All Investors), which

_____

[5] According to the special warranty deed for the conveyance of the Adjacent Lot from Tauber VI to Buzzards Point LLC (Exhibit 8), LNT&A Master LLC was the sole member of Tauber VI. The Defendants have produced no evidence, nor have the Plaintiffs made any claim, however, that the Plaintiffs had any membership or ownership interest in either LNT&A Master LLC or Tauber VI, which subsequently sold the Adjacent Lot for a fraction of its then value.

[6] The Defendants should be bound by their own assertion to their investors, for the purposes of the present motion, that the funds with which the Plaintiffs were paid were derived from Tauber I, in which LNT&A Master LLC had no apparent involvement. Compare the signature block from Exhibit 7 (Deed from Tauber I to Tauber VI) to Exhibit 8 (Deed from Tauber VI to Buzzards Point LLC).

Defendants, via their attorneys indicated was in need of demolition.  See Joseph Whitebread's April 16, 2006 letter at 2, ¶ 2 ("It was entirely possible, perhaps even likely, that the [Transpoint] building would have to be scrapped and replaced" at the end of the 5-year lease extension to the Coast Guard).

16) Count I of the Complaint is a breach of fiduciary duty claim alleging that – after the properties were conveyed to the "single partnership" on January 1, 1985, one or more of the Defendants diverted funds from refinances involving the subject properties to one or more of the other defendants, and that the Plaintiffs' investment income was diminished as a result of mortgages taken out on the subject properties that were taken for the benefit of one or more of the other defendants.

17) The offending transactions at issue in Count I are believed to have occurred after the subject properties were purportedly transferred into the "single partnership" in on January 1, 1985.

18) On or about May 26, 2004, Defendants permitted Plaintiffs' accountants to review (but not reproduce) limited documents related to the DCJV.  <u>However, Defendants denied Plaintiffs access to documents related to the use to which funds from mortgages that occurred in 1987, 1993 and 1999 were made.</u>  The Defendants, via their counsel, again rejected the Plaintiffs' request (made by letter dated December 15, 2005, Exhibit 11) for access to financial documentation related to the mortgages.[7]  See Exhibit 12, Whitebread letter dated January 18, 2006, p. 2 ¶¶ 3-4.

---

[7]  The December 15, 2005 (Exhibit 11) request for documentation specifically requested:

> 1.    Supporting detail showing how the distributions to Wolff over the term of the ventures were determined, with priority given to 1993 through 2004.

19) According to the December 6, 1984 letter (Exhibit 2), all transactions undertaken in relation to the subject properties between January 1, 1985 and January 2, 1999 (when Defendants unilaterally created new Limited Liability Companies, including Tauber I, and transferred the assets from the "single partnership," thereto; *see e.g.* Exhibit 5, December 4, 2002 letter from Westwood Management at 2, ¶ 2.) were undertaken by Dr. Tauber on behalf of the "single partnership."

20) According to the deeds Defendants filed with the District of Columbia, all transactions undertaken after January 2, 1999 related to the subject properties were executed by John Droke, on behalf of Westwood Management, LLC as Managing Member of Tauber I. *See, e.g.,* Exhibit 6, January 29, 2004 Special Warranty Deed for conveying the Transpoint Building from Tauber I to TBC Funding Group.

21) With regard to Count I, the Plaintiffs do not assert that they were members of LNT&A Master LLC. The only assertion Plaintiffs make with regard to LNT&A Master LLC is that it was one of the ultimate recipients of funds that were improperly diverted from the District of Columbia Joint Venture after the DCJV's asserts were purportedly

---

2.    Accounting records for 2004 – these had not yet been prepared when Navigant Consulting was provided access to information at Westwood.

3.    Detailed financial information regarding the sale of the Transpoint Building, the associated land and the adjacent lot, including the split of the sales price between the land and building and the basis for that split, costs directly related to the sale and other elements used to arrive at the net proceeds from those sales.

4.    Support for the amounts included in the schedule attached to the March 12, 2004 letter.

5.    Information identifying the street address, square and lot information for the lot adjacent to the Transpoint building.

transferred to the single partnership referenced in Dr. Tauber's letter of 1984.   See Complaint ¶ 37.

22)  Count II of the Complaint is a claim premised on either Investor's Holding Corporation's (formerly Westwood Management Corporation) and/or Westwood Management LLC's and/or Mr. Droke's decision[8] to distribute the proceeds of the sale of the Transpoint Building so as to favor owners with a proportionately larger share in the building (which according to the Defendants was in need of demolition, *supra*), to the disfavor of those investors with a proportionately larger share in the land, such as the Plaintiffs, whose interest in the land was twice that of their interest in the building (0.5% versus 0.25%, see Exhibit ).

23)  Count II contains no claim that Plaintiffs were members of LNT&A Master LLC so as to make them subject to the arbitration provision found in the LNT&A Master LLC operating agreement. *See* Complaint ¶ 41-42.

24)  Count III of the Complaint is a claim against John Droke, Westwood Management LLC (and/or IHC) for selling the Adjacent Lot to Tauber VI for less than its market value.

---

[8]  While the cover Memorandum announcing the sale of the Transpoint building and providing the payment for Plaintiffs' share thereof (Exhibit 10, February 25, 2004) is signed by John Droke on Westwood Management <u>LLC's</u> letterhead, and while he executed the sale of the Transpoint Building and Adjacent Lot on behalf of Westwood Management LLC (See Exhibit 6, and 7),  Dr. Tauber's December 6, 1984 letter (Exhibit 2, p. 1, ¶ 3) and a December 4, 2002 letter (Exhibit 5, p. 1, ¶ 2) from Westwood Management <u>Corporation</u> (which has remarkably similar letterhead as that of Westwood Management LLC) indicates that Westwood Management Corporation (now Investor's Holding Corporation) was the "property manager for the real estate holding of Laszlo Tauber." Therefore it is unclear which person(s) or entity (entities) made the allotment of the sale proceeds.

19) Count III contains no claim that Plaintiffs were members of LNT&A Master LLC so as to make them subject to the arbitration provision found in the LNT&A Master LLC operating agreement. *See* Complaint ¶ 47.

20) Count IV of the Complaint is a claim against John Droke, Westwood Management LLC (and/or IHC) for selling the Adjacent Lot to Tauber VI for less than its market value.

19) Count IV contains no claim that Plaintiffs were members of LNT&A Master LLC so as to make them subject to the arbitration provision found in the LNT&A Master LLC operating agreement.  *See* Complaint ¶ 55.

20) Count V of the Complaint is similar to Count I, discussed *supra*, except that it is the derivative version of that claim.

13) Count V contains no claim that Plaintiffs were members of LNT&A Master LLC so as to make them subject to the arbitration provision found in the LNT&A Master LLC operating agreement.  *See* Complaint ¶ 59-60.

## APPLICABLE LAW

### A.    Summary Judgment Standard

The Plaintiffs accept the Defendants' assertion that motions to compel arbitration are governed by the same standards that govern a Motion for Summary Judgment made pursuant to Rule 56(c).  See Def's Memorandum at 6 ("A motion to compel arbitration is properly reviewed under the summary judgment standard of Rule 56(c).")

Therefore, the Defendants have the burden of demonstrating that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Proc. 56(c).

A court deciding a Motion for Summary Judgment must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in his favor:

> [T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150-52 (2000).  "A district court may grant summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Waterhouse v. District of Columbia,* 298 F.3d 989 (D.C. Cir. 2002) (internal citations omitted).

In considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  The court must determine, "not whether [it] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented." *Id.* at 252.

**B.    <u>Arbitration Provisions Governed by the Federal Arbitration Act</u>**

The Defendants invoke the Federal Arbitration Act as the sole source for their claim of a right to move for arbitration. See Def's Memorandum, *passim*. That statute, 9 U.S.C. § 2 reads as follows:

> A written provision in any maritime transaction or a contract evidencing a transaction <u>involving commerce</u> to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, <u>save upon such grounds as exist at law or in equity for the revocation of any contract</u>. (emphasis added).

In order for the FAA to be applicable, the controversy is required to *impact interstate commerce*. *See Bryson v. Gere*, 268 F. Supp. 2d 46 (D.D.C. 2003)("Diversity actions … fall within the provisions of the [Federal Arbitration] Act as long as the arbitration agreement involves or affects interstate commerce."). *See also Thompson v. Lee*, 589 A.2d 406, (D.C. 1991) ("The federal arbitration law applies to contracts evidencing a transaction involving commerce."); and see *Coles v. Redskin Realty Co.*, 184 A.2d 923, 927 (D.C. 1962), cited therein.

## C.    <u>Standard Regarding Motions To Compel Arbitration</u>

The first step in evaluating a motion to compel arbitration is to determine whether the parties agreed to arbitrate. This determination depends on two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002). The question of whether an agreement to arbitrate exists is left to contract principles. *See First Options v. Kaplan*, 514 U.S. 938, 943 (1995) ("When deciding whether the parties agreed to arbitrate a

certain matter … courts generally … should apply ordinary state-law principles that govern the formation of contracts)(*citing Volt Info. Scis. v. Bd. of Trs.,* 489 U.S. 468 (1989), *Perry v. Thomas,* 482 U.S. 483, 492-493, n. 9 (1987)).  The question of whether an agreement to arbitrate exists is not governed by the liberal federal policy creating a presumption of arbitrability that followed passage of the Federal Arbitration Act, 9 U.S.C. § 2.  *See Fleetwood,* 280 F.3d at 1073 ("this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead ordinary contract principles determine who is bound.") (*relying on*, *Volt*, 489 U.S. 468 (1989), *EEOC v. Waffle House*, 534 U.S. 279 (2002), *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994), *Daisy Mfg. Co., Inc., v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994); *and see Comer v. Micor, Inc.*, 436 F.3d 1098, n. 11 (9th Cir. 2006) (concluding that where the question is whether the parties have an agreement to arbitrate, "the liberal federal policy regarding the scope of arbitrable issues is inapposite") (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) and *Fleetwood Enters., Inc.*, 280 F.3d at 1073)); *Institut Pasteur v. Chiron Corp.*, 2005 U.S. Dist. LEXIS 2177, *31 (D.D.C. 2005) ("[the] federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead ordinary contract principles determine who is bound.").

"Notwithstanding the federal policy in favor of arbitration, the FAA places contracts requiring arbitration on equal footing with all other contracts.  The party seeking to compel arbitration bears the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate, just as the party seeking relief

under any other alleged contract has the burden of proving that contract's existence. Moreover, agreements to arbitrate under the FAA are subject to avoidance upon such grounds as exist at law or in equity for the revocation of any contract." *United States v. Stein*, 2006 U.S. Dist. LEXIS 63445 (D.N.Y. 2006) (internal citations and footnotes omitted).

## **ARGUMENT**

**A.**    **The Defendant Has Failed to Demonstrate that No Genuine Disputes of Material Facts Exist as to Whether an Agreement to Arbitrate Exists as to the Parties to this Litigation**

The Defendant has utterly failed to present any evidence that would demonstrate that no genuine dispute exists as to: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002).

Because this motion is to be treated under the same standards as a Rule 56(c) motion for summary judgment, Local Rules 7(h) and 56.1 of this Court require the moving party to submit a "statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." In this case, the Defendants have failed to comply with this rule. As such, they had not provided the Court with any justification that – pursuant to Rule 56(c) – they are entitled to judgment on the issue of arbitration as a matter of law.

"In determining the undisputed facts that exist in a case for the purposes of reviewing a motion for summary judgment, this Court *strictly* adheres to the text of Local

Civil Rule 56.1." *Gibson v. Office of the Architect of the Capitol*, 2002 U.S. Dist. LEXIS 27602, at *1 (D.D.C. November 19, 2002) (*emphasis in original*). Defendants' failure to include a set of material facts as to which there is no genuine issue therefore on its own calls for an outright denial and dismissal of its motion. See *Argueta v. Government of the District of Columbia*, 355 F. Supp.2d 408, (D.D.C. 2005) (dismissing defendant's motion for summary judgment for failure to submit a statement of material facts not in dispute).

**B.**     **The Federal Arbitration Act Is Inapplicable To This Controversy**

The Defendants' motion relies in whole on the Federal Arbitration Act (FAA), 9 U.S.C. § 2, which is inapplicable to this controversy. In order for the FAA to be applicable, the controversy is required to *impact interstate commerce*. *See Bryson v. Gere*, 268 F. Supp. 2d 46 (D.D.C. 2003)("Diversity actions … fall within the provisions of the [Federal Arbitration] Act as long as the arbitration agreement involves or affects interstate commerce."). *See also Thompson v. Lee*, 589 A.2d 406, (D.C. 1991) ("The federal arbitration law applies to contracts evidencing a transaction involving commerce."); and see *Coles v. Redskin Realty Co.*, 184 A.2d 923, 927 (D.C. 1962), cited therein.

In this case, the Defendant has not even claimed (and certainly has not demonstrated) that the DCJV agreement involves interstate commerce. The Defendants cannot simply utter an incantation to extend the provisions of the FAA to this controversy; instead, they must first demonstrate that the FAA applies. Under Rule 56(c) they must demonstrate that no genuine dispute with regard to the material facts demonstrating that the controversy at issue affects interstate commerce. *See* 268 F. Supp. 2d 46, *Reeves,* 530 U.S. at 150-52, and Rule 56(c).

The Defendants have utterly failed to uphold their Rule 56(c) burden on this issue, and the present motion should be denied as a result.

**C.**    **The Arbitration Provision Did Not Survive Beyond January 1, 1985**

The DCJV reads, at Paragraph 15, that the parties (Dr. Tauber and Egon Wolff) "agree not to enter into any court action in any dispute which may arise *during construction and management* of the office building complex and agree that any dispute or controversy that cannot be amicably settled will be submitted to arbitration." (*emphasis added*). Thus, the plain meaning of the arbitration clause demonstrates that the agreement to arbitrate pertains not to disputes that arise *from* the Joint Venture agreement or from Dr. Tauber's management of the Transpoint building, but instead associated only *temporally* with Dr. the construction and Dr. Tauber's management of the Transpoint Building.

The current dispute is not subject to the arbitration provision for several reasons as explained below.

**i.**    **DCJV Arbitration Provision did Not Survive Merger**

After the subject properties were transferred to the "single partnership" as established in the December 6, 1984 letter (Exhibit 2) the DCJV, along with its the terms and obligations, was extinguished. From that point on, the members of the former DCJV had the rights provided to them under the December 6, 1984 letter. For the Plaintiffs, this means that the only rights and obligations that survived the DCJV were the Plaintiffs' ownership interests of a 0.5% interest in the land and a 0.25% interest in the building. *See* Exhibit 2, Dec. 6, 1984 letter ("If anybody has any second thoughts I will put his/her

interest in trust, but I have to proceed with the above outlined plan [merger of all joint ventures into a "single partnership"] without any further delay."

Since the rights and obligations created by the DCJV (including the arbitration provision) were extinguished by the December 6, 1984 letter,[9] the DCJV arbitration agreement was no longer applicable after that date. The Defendants have made no argument or showing that the parties intended to be bound by any provisions of the original DCJV, with the obvious exception of the provision establishing the Plaintiffs' ownership interest as referenced in the trust offering, once the trust relationship was created on January 1, 1985. *See Sims v. Westminster Investing Corp.*, 648 A.2d 940, 942 (D.C. 1994) (In the District of Columbia, "[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms, and (2) intention of the parties to be bound."); *see also Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 546-47 (D.C. 1981).

The Defendants have utterly failed to uphold their Rule 56(c) burden on the issue of whether the arbitration provision survived the demise of the DCJV on December 1, 1985, and the present motion should be denied as a result.

**ii.**    **This Dispute Is not Within the Scope of the DCJV Arbitration Agreement**

Even if the Court were to find that an arbitration agreement survived beyond January 1, 1985, the DCJV's arbitration agreement is inapplicable here because the disputes are not contained within the scope established in the arbitration provision itself.

While the Defendant claims that the DCJV's arbitration agreement "reflects the

---

[9] Note that in furtherance of the argument that the December 6, 1984 letter and the "single partnership" created thereby extinguished the DCJV's arbitration provision, the "single partnership," which the Defendants refer to as Laszlo N. Tauber MD & Associates (see Def's Memorandum at 4) apparently had its own arbitration provision that applied to the partners thereof. See Def's Memorandum at 4, n. 4.

Plaintiffs' agreement to arbitrate any disputes," (Def's Memorandum at 7, last ¶) the actual language of the DCJV arbitration agreement does nothing of the sort.  Instead, it states, in pertinent part that the parties "agree not to enter into any court action in any dispute which may arise *during construction and management* of the office building complex."  (*emphasis added*).

But this dispute arose and this civil action was initiated well after the DCJV was extinguished and after management of the office building complex was transferred to the "single partnership" (in 1985) and then to Tauber I (in 1999).  Moreover, the transactions that give rise to the Defendants' liability with regard to the financial management of the DCJV's former assets[10] did not occur until after creation of the 1985 "single partnership." Therefore, the origins of the dispute (the "single partnership's" diversion of mortgage proceeds to other partnerships and ventures between 1985 and 1999[11]) did not occur during the time that the DCJV was responsible for the construction and management of the office building complex. As such, the terms of the DCJV's arbitration provision expressly exclude the dispute at issue here.

The Defendants have utterly failed to uphold their rule 56(c) burden on the issue of "whether the dispute in question falls within the scope of [the] arbitration agreement" if one indeed exists.  *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002).  The Defendants have not elucidated any specific claims that they contend to be covered by the arbitration agreement.   Instead, the Defendant's Motion and Memorandum are replete with the mere conclusions, devoid of any factual analysis or

---

[10] Addressed in Count I and Count V of the Plaintiffs' Complaint.
[11] Documentation of which was denied to the Plaintiffs and their accountants in 2004 and 2006.

evidentiary support, that, "Plaintiffs have sued to enforce rights they claim have been violated arising out of the DCJV partnership agreement," (Def's Memorandum at 7) and "Plaintiffs have alleged that the Defendants acted in concert to breach fiduciary and contract duties owed to them stemming from the DCJV partnership agreement." Def's Memorandum at 8.

Moreover, because prior to this litigation, the Defendants failed to provide the Plaintiffs with access to documents related to the financial transactions at issue (see Pls' Material Fact No. 15, *supra*), the Plaintiffs are as of yet unable, except as argued herein above, to demonstrate which persons or entities were ultimately responsible for the conveyances and financial transactions at issue and are therefore unable to defend against this motion to compel arbitration without the benefit of discovery.[12]

**D.     Even if the DCJV Arbitration Agreement Survived and Would Ordinarily Apply to this Dispute, Equitable Principles Estop the Defendants from Resorting to the Arbitration Agreement**

Equitable considerations sufficient to avoid an ordinary contract likewise operate to avoid an agreement to arbitrate.

> As the 'saving clause' in § 2 [of the Federal Arbitration Act] indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so. To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract -- a situation inconsistent with the 'saving clause.'

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (U.S. 1967).

---

[12] Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, except as argued herein, the Plaintiffs are without additional documentation to demonstrate that the financial transactions at issue in this civil action were undertaken by persons other than Dr. Tauber on behalf of the DCJV.

In this case, the Plaintiffs assert the doctrine of estoppel and unclean hands to prevent the Defendants from enforcing the arbitration provision of the DCJV while they reject the extension of other rights found therein (Plaintiffs' right to inspect financial records).

> In its classic formulation, that maxim provides that whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.

*DRG Funding Corp. v. Secretary of Housing & Urban Dev.*, 1988 U.S. Dist. LEXIS 16526 (D.D.C. 1988) (*citing* 2 J. Pomeroy, A Treatise on Equity Jurisprudence § 397 at 91 (5th ed. 1941)).

The Defendants' actions – including in particular: 1) concealing the continued existence of the DCJV between 1985 and 1999; and 2) denying the Plaintiffs the ability to review the records of financial transactions made after 1985 – have had the effect of denying the Plaintiffs rights that they would normally have under the DCJV, namely under paragraph 8 of the DCJV, which reads: "Dr. Tauber will keep proper records of all construction activities in regard to the joint venture and will obtain and keep properly posted books of account relating to the business of the joint venture. Said records and books of account, as well as any and all bank accounts, checks, etc. of the venture will be kept available for your inspection at all reasonable times."

The doctrine of unclean hands prevents the Defendants from asserting a privilege of the DCJV with regard to the Plaintiffs' claims (the arbitration provision) while at the same time they reject the plaintiffs' rights (inspection) under the same agreement:

> The unclean hands … maxim closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief … In applying the doctrine, what is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants. *Thus, equity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue.*

*Ellenburg v. Brockway, Inc.*, 763 F.2d 1091 (9th Cir. 1985)(*emphasis added*) (*citing Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945); *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir. 1963); *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944); *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933)), *cited with approval by the D.C. Circuit Court of Appeals in Holt v. Winpisinger,* 811 F.2d 1532, n. 74 (D.C. Cir. 1987). *See also E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187 (3d Cir. 2001), for the inverse of this proposition: "To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.'"

**E.    The Plaintiffs Never Consented to be Governed by Subsequent Partnership Agreements**

In the District of Columbia, "[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms, and (2) intention of the parties to be bound." *Sims v. Westminster Investing Corp.,* 648 A.2d 940, 942 (D.C. 1994); *see also Edmund J. Flynn Co. v. LaVay, 431 A.2d 543, 546-47 (D.C. 1981).*  The Court of Appeals has also indicated that for a contract to be enforceable, "there must be an offer and an acceptance and the agreement must be supported by consideration.*" Goozh v. Capitol Souvenir Co.*,

462 A.2d 1140, 1142 (D.C. 1983); *see also Brown v. Brown*, 343 A.2d 59, 61 (D.C. 1975).

The Defendant argues that, in addition to the arbitration provision found in the 1971 DCJV (which has been demonstrated to be inapplicable, *supra*), the Plaintiffs were bound by the Laszlo N. Tauber MD. & Associates[13] arbitration agreement (Def's Memorandum at 4, n. 4) and the March 3, 2006 arbitration provision found in the LNT&A Master, LLC Operating Agreement. Def's Memorandum at 4.  Neither of these agreements is applicable to the plaintiffs as demonstrated immediately below.

> **i.    Defendants Have Not Made Any of the Required Showings Regarding the Alleged Laszlo N. Tauber MD & Associates Arbitration Agreement.**

The Defendants are required, pursuant to the Rule 56(c) standard to demonstrate that no genuine dispute exists as to "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." (*Fleetwood Enters. Inc.*, 280 F.3d at 1073.  In the face of this challenging standard, the Defendants have not even attached the purported Laszlo N. Tauber MD & Associates Arbitration Agreement as an exhibit to their motion.  Instead, the Defendants have merely quoted an excerpt of the Paragraph 12 of the subject partnership agreement which reads: "The parties agree hereto [*sic*] not to institute any court action in connection with any dispute which may arise relative to this Partnership and agree that any dispute or controversy that cannot amicably be settled shall be submitted to binding arbitration. …"  *See* Def's Memorandum at 4, n. 4.

---

[13] The Defendants refer to the single partnership to which the DCJV's assets were purportedly transferred on January 1, 1985 as "Laszlo N. Tauber MD. & Associates" or "LNT&A Partnership."  *See* Def's Memorandum at 3-4.

Setting aside for the moment the fact that the Defendants have not demonstrated the existence of this arbitration agreement (or its effective date) by providing it as an exhibit to their motion, the Defendants have additionally failed to demonstrate, in accord with the Rule 56(c) standard, that the Plaintiffs were partners of Laszlo N. Tauber MD & Associates.  For the purpose of this inquiry it must be remembered that the Defendants have conceded (see Def's Memorandum at 2, n. 1) that Dr. Tauber agreed to hold the Plaintiffs' interest in trust.  Complaint, ¶ ¶ 23-25.  As a result, the Plaintiffs were not partners in Laszlo N. Tauber MD & Associates.  Moreover the Defendants have likewise failed to demonstrate that the financial transactions at issue would be within the scope of the agreement.  Specifically for the purpose of this inquiry, the exhibits submitted in this Opposition brief demonstrate that Laszlo N. Tauber MD & Associates had no involvement in the transfers and conveyances of the subject properties.  *See, e.g.* Exhibits 4, 6, and 7.  As a result, the Defendant has provided no explanation or argument for its contention that the controversy before the court would be included with the scope of the Laszlo N. Tauber MD & Associates arbitration agreement, even if the Plaintiffs are found to have been partners thereof.

**ii.    Defendants Have Not Demonstrated that the Plaintiffs Were Members of LNT&A Master LLC**

While the Defendants argue that the Plaintiffs were members of the LNT&A Master LLC,[14] they have provided absolutely no evidence, either of the Plaintiffs'

---

[14] The Defendants assert in their memorandum that, "in 1998, Dr. Tauber reorganized LNT&A Partnership into several LLCs in order to limit the liability of the partnership interest. The Principal LLC was LNT&A Master, which wholly owned a number of subsidiary LLCs, which in turn owned the various properties previously held by LNT&A Partnership. The Transpoint Building and the Adjacent Lot were placed into the Laszlo N. Tauber & Associates I, LLC (Tauber I) subsidiary." Def's Memorandum at 4.

membership in LNT&A Master LLC or of any transactions whereby LNT&A became the owner of the properties formerly owned by the DCJV. While the Defendants claim that the Plaintiffs complaint establishes these facts for the purposes of this motion (Def's Memorandum at 4, citing the Complaint at ¶ 27) it most certainly does not. The Complaint contains no assertion that the Plaintiffs were members of LNT&A Master LLC, and Paragraph 27 of the Complaint reads only: "In 1999, the Transpoint Building and the Adjacent Lot were transferred, along with three other properties to Tauber I."

As far as the Plaintiffs know, they were members of the DCJV, and thereafter their ownership interests therein were held in trust, while the real property was conveyed to Tauber I. *See* Exhibit 4 (January 2, 1999 Special Warranty Deed).

The Defendants have failed to demonstrate, in accordance with Rule 56(c) that the Plaintiffs were members of LNT&A Master LLC. They have certainly therefore not demonstrated that the Plaintiffs should be governed by the arbitration agreement that was inserted into the LNT&A Master LLC operating agreement on in March 2006.

### iii.    In the Alternative, if the Plaintiffs were Members of LNT&A Master, They Were Not Members as of March 3, 2006

The Defendants claim that the Plaintiffs should be bound by a March 3, 2006 amendment to the LNT&A Master LLC Operating agreement which added an arbitration agreement that requires, in pertinent part, "[a]ny dispute, controversy or claim arising out of or relating to this Agreement including but not limited to: (i) any claim for payment of a greater share of the income, profits, or proceeds of the LLC; (ii) any claim relating to payment of a greater share of the income, profits, or proceeds of the predecessors of the LLC whose assets and liabilities were acquired by the LLC, including Laszlo N. Tauber

23

Md. & Associates, and or its predecessor joint interest … shall be finally settled by arbitration."  *See* Def's Exhibit 3.

The Defendants have offered no argument whatsoever for this proposition.   First, the Defendants have failed to demonstrate, in accordance with their Rule 56(c) obligations, that the Plaintiffs belong to the category of persons who would be bound by the arbitration agreement,[15] or that the current disputes arise out of the LNT&A Master LLC Operating Agreement.[16]  In fact, the documents presented herein demonstrate that the subject properties were conveyed directly from the DCJV to Tauber I and then to third parties.   There is no indication that they were ever conveyed to LNT&A Master LLC.  See Exhibits 4, 6, and 7 (January 2, 1999 Warranty Deed and Warranty Deeds for sale of Transpoint Building and Adjacent Lot.)

Second, if the Plaintiffs were indeed members of LNT&A Master LLC, then their membership in that LLC was only by grace of LNT&A Master LLC ownership of the subject properties (which purported ownership the Defendant has failed to establish). Therefore, once those properties were disposed of by sale to third parties and the proceeds of those sales were distributed to the Plaintiffs (no later than April 27, 2005; see Exhibit 9 "[Laszlo I] sold it's [*sic*] last remaining land interest associated with the Transpoint Building."), the Plaintiffs are unaware of any claim or basis by which they would still be considered members of LNT&A Master LLC.  There is certainly no reason

---

[15] For example, the arbitration agreement does not indicate that persons whose interests are held in trust by wholly owned subsidiaries of LNT&A Master LLC are bound thereby.

[16] Specifically, that this civil action involves a dispute over "claims for payment of proceeds of LNT&A Master LLC" or that the income and ultimate profits generated by the subject properties were "proceeds of the predecessors of the LLC whose assets and liabilities were acquired by the LLC." *See* LNT&A Master LLC Arbitration provision at ¶ (a), (i) and (ii).

to believe that the Plaintiffs would have been members of LNT&A Master LLC as of March 3, 2006 when the arbitration provision was added.  As a result, they cannot be bound by the March 3, 2006 provision.  In this regard *United States v. Stein*, 2006 U.S. Dist. LEXIS 63445 (S.D.N.Y. 2006) is directly on point.

In *Stein*, KPMG argued that nine former partners were bound by an arbitration agreement that had been incorporated into the KPMG partnership agreement after their respective partnership relationships had terminated.  The court determined, however, that the partners were not subject to the arbitration agreement that had been imposed <u>after their partnerships with KPMG terminated.</u>  Instead, the court held that the partners were bound by the partnership agreements that were in place when the partners last received a benefit of partnership:

> None of the KPMG Defendants remains employed by the firm. KPMG therefore relies heavily on the language in the 2003 Agreement that obligates a Separated Member -- a former partner or principal -- to arbitrate certain disputes with the firm. But it is undisputed that eight of the KPMG defendants -- Messrs. Bickham, DeLap, Greenberg, Lanning, Larson, Pfaff, Ritchie, and Watson -- left KPMG prior to October 1, 2003, the date on which the 2003 Agreement became effective. One additional defendant, Mr. Wiesner, left the firm after the effective date of the 2003 Agreement, but entered into an agreement with KPMG that provides that his relationship to the firm is governed by the partnership agreement as amended and restated as of April 15, 2002. There is no evidence he ever became a party to the 2003 Agreement. *In consequence, these nine defendants are not bound by the 2003 Agreement*.

*Stein*, 2006 U.S. Dist. LEXIS 63445, *36 (D.N.Y. 2006) (*emphasis added*).

Furthermore, assuming <u>only for the sake of this argument in the alternative</u> that the Plaintiffs were members in LNT&A Master LLC only until April 27, 2005 (the date that the final distribution of proceeds from the sale of the subject property was made. *See* Exhibit 9, April 27, 2005 Memorandum accompanying final distribution), there is no

indication that they ever consented to be bound by later amendments to the LLC's operating agreement. *C.f. Central Kan. Credit Union v. Mutual Guar. Corp.*, 886 F. Supp. 1529, 1541 (D. Kan. 1995) ("Upon joining a society whose constitution or bylaws make a clear reservation of the right to amend, one is bound to take notice of the existence and effect of that reserved power, as it constitutes one of the provisions of his contract of membership; and not only a member but his beneficiary likewise is bound by a change or amendment of the bylaws under an express reservation of such power.") (*quoting* 36 Am. Jur. 2d Fraternal Orders and Benefit Societies § 20 (1968).

If, in the alternative, the Plaintiffs' purported membership in the LNT&A Master LLC continues to exist, then the Plaintiffs are eager to learn the current value of that membership and look forward to arguing – based on the doctrine of estoppel and *res judicata* – that the Defendants have admitted that, despite their failure to distribute any proceeds or profits to the Plaintiffs for the past two years, the Plaintiffs continued (and continue) to have an ownership interest in LNT&A Master LLC and an entitlement to all benefits of membership therein.

## CONCLUSION

Based on the foregoing, the Defendants have absolutely failed to uphold their burden under Rule 56(c) to demonstrate the existence of one or more arbitration agreements that bind the Plaintiffs and include the disputes that are subject to this civil action.

As a result, the Defendants' Motion to Compel Arbitration should be denied with prejudice.

Respectfully Submitted,

_____
Leslie D. Alderman III (D.C. # 477750)
ALDERMAN & DEVORSETZ, PLLC
1025 Connecticut Ave., NW
Suite 1000
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224