# Holland + Knight

Tel 202 955 3000
Fax 202 955 5564

Holland & Knight LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006-6801
www.hklaw.com

Joseph B. Whitebread, Jr.
202 419 2463
joseph.whitebread@hklaw.com

January 18, 2006

**By Email And**
**First Class Mail**

Leslie D. Alderman III, Esq.
Alderman & Deborsetz
1025 Connecticut Avenue, NW
Suite 100
Washington, DC 20036

Re:  Elliott Wolff

Dear Les:

Pursuant to our recent telecon, the following is provided as a response to your December 15, 2005 letter to me concerning your clients, Elliott Wolff and the trust referred to in your letter.

At our meeting in November 2005, Mr. Wolff stated that Dr. Tauber had agreed to treat Mr. Wolff as a non-member of the consolidated partnership (Westwood Joint Venture, later known as Laszlo N. Tauber M.D. & Associates---collectively "LNT&A Partnership", and its successor limited liability company LNT&A Master, LLC---"LNT&A LLC"). Apparently in support of that position, I believe that Mr. Wolff and/or you indicated at that meeting that Mr. Wolff had been allocated depreciation on the Transpoint Building.

We have carefully reviewed your December 15th letter and the attachments provided, and we have concluded that neither the letter nor the attachments support in any manner the propositions described above ---i.e., the "non-member" status of, and the allocation of depreciation to, your clients.

Perhaps there are some other documents that your clients have that would support your position, but based upon your December 15th letter, we are not aware of any theory that would allow you to challenge the formation of the LNT&A Partnership in 1984 and your clients' status as B Partners therein. Your clients' status as B Partners was provided for pursuant to the letters sent to all partners by Dr. Tauber in 1984, and that status has been the basis of the checks sent to Mr. Wolff and the trust for the last 21 years. If your clients were dissatisfied with that status,

January 10, 2006
Page 2

they could have elected to become some other type of partner and/or they could have challenged their treatment as a B Partner pursuant to subsequent proceedings. Perhaps, if your clients had agreed to a sale of their interests, that might also have been consummated. However, your clients did none of these things.

At our meeting on November 4, 2005, we did not discuss Mr. Wolff's letter to Dr. Tauber dated May 13, 1994; the trust's attorney (Andrew Ball) wrote a letter to the same effect also dated May 13, 1994. Both letters respond to Dr. Tauber's offer to permit B Partners to convert their interests into a new status pending formation of a REIT. Mr. Wolff indicates in his letter (as does the trust in its letter by incorporating Mr. Wolff's letter) that he would be willing to convert his interest to the new "B REIT" interest provided that the cash flow used for this purpose was increased from $20,000 per 1% to $25,000 per 1%. Neither of your clients expressed any dissatisfaction with their status as B Partners in their May 13, 1994 letters, and each of them conditionally accepted a change to a different B Partner status. In short, the May 13, 1994 letters are inconsistent with your current position and, from our standpoint, foreclose an effort now to change from the B Partner interests that your clients seemingly found to be acceptable in 1994.

As far as we can see, your clients have consistently been treated as B Partners and have been paid all required distributions pursuant to that status.

Your December 15th letter requests access to additional information and documents. As you know, in early 2004, Mr. Wolff's accountant and other representatives inspected the books and records pertaining to the Transpoint Property over a 3 or 4 day period at the premises of Westwood Management LLC. Your current request for additional information fails to acknowledge that your clients have already been given extremely generous access to these records. **In fact**, if your position were correct---*i.e.,* that Mr. Wolff and the trust have never been members of LNT&A Partnership and LNT&A LLC---then there would be no justification whatsoever for your clients' inspection of the records of these entities in the first instance.

Notwithstanding the foregoing, you have nevertheless requested further access to documents and information pertaining to the Transpoint Property. In attempting to respond to your request, we are having difficulty understanding the basis of your clients' claim and, in any event, why any such possible claim would not be barred by the applicable statute of limitations. The 1984 letters you furnished us indicate that Mr. Wolff wanted to be treated as a dissenter to the consolidation arrangement. It is clearly too late in the day to make that assertion now, some 21 years after the partnership consolidation and roll-up transaction was completed.

In your letter you also ask for the source of the information regarding distributions to your clients which was provided to you after the meeting in Roger Pies' November 15, 2005 letter. The information furnished by Mr. Pies was based exclusively upon the K-1s sent to Mr. Wolff and the trust over the years. We had thought that either Mr. Wolff or his professional advisors have copies of all of those K-1s in their files. Moreover, as that information shows, your clients' investment resulted in an extraordinary high level of return with respect to their

January 10, 2006
Page 3

interests, and we really do not see why the Wolff family would have anything to complain about given the extraordinary success they enjoyed in their investment with Dr. Tauber.

If, however, you do not agree, could you explain in a subsequent letter why you believe you have a basis to challenge what happened in 1984, 1994, and subsequent years.

Sincerely,

Holland & Knight LLP

Joseph B. Whitebread, Jr.

Cc:   Roger A. Pies

# 3519831_v1