UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELLIOT WOLFF, et al., <br><br> Plaintiffs, <br><br> v. <br><br> WESTWOOD MANAGEMENT LLC, et al., <br><br> Defendants. | Civil Action 06-01234 (HHK) |

MEMORANDUM OPINION

Elliot Wolff brings this action personally and as trustee of the Egon Wolff Trust against Westwood Management LLC and other associated entities (collectively "defendants"), alleging breach of fiduciary duty and derivative claims, all of which stem from the management and sale of property in which Wolff's father invested over 35 years ago. Before the court is defendants' motion to compel arbitration [#4] under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted.

I. BACKGROUND

In 1971, Wolff's father purchased a share in a real estate partnership venture created by Dr. Laszlo Tauber. The purpose of the venture, which was called the District of Columbia Joint Venture ("DCJV"), was to own and develop a parcel of land located in the District of Columbia into an office building complex. According to the DCJV agreement, Wolff's father purchased an

ownership interest of 0.5% in the land and 0.25% in the building for $20,000. The DCJV agreement also included an arbitration clause, which provided that the parties "agree not to enter into any court action in any dispute which may arise during construction and management of the office building complex and agree that any dispute or controversy that cannot be amicably settled will be submitted to arbitration." Defs.' Ex. 1 ("DCJV Agreement") ¶ 15.

Tauber successfully developed the land into what is now the Transpoint building and later purchased an adjacent half-acre parcel of land to be used as a parking lot. When Wolff's father died in November 1984, his ownership interest in the DCJV passed to his son and to the trust established under his estate. On December 6, 1984, Tauber sent a letter to the investors in the DCJV and to the investors in the various other joint ventures he managed to inform them that he was restructuring the joint ventures into a single partnership that he would control.[1] In the letter, Tauber explained that the consolidation would facilitate management of the various properties and would more easily allow for a sale or merger with a larger company. The letter offered investors three options: (A) to sell their interest, (B) to become class "B" partners, or (C) to become class "C" partners. Each class contained a different kind of investment in the new partnership with a different pay structure. The letter additionally offered, "[i]f anybody has any second thoughts and is not willing to cooperate, I will put his/her interest in trust . . . ." Defs.' Ex. 2 (Tauber Ltr., Dec. 6, 1984) at 6 ("1984 Tauber Letter"). Investors were asked to respond to

---

[1] Defendants refer to the single partnership as Laszlo N. Tauber M.D. & Associates or LNT&A Partnership. Wolff, however, asserts that defendants "provide no evidence of the actual existence of any entity with either of these names." Pls.' Opp'n at 2 n.1. Although Wolff correctly assert that no evidence has been proffered establishing the name of this entity, the evidence in this case demonstrates that such an entity did exist. Accordingly, the court will refer hereinafter to the partnership created by the December 6, 1984 letter as the "Consolidated Partnership."

the letter and choose one of the three options, with option "B" to be the default position if no response was returned to Tauber by the date specified. In response to the letter, Wolff declined to become an investor in the new partnership and asked Tauber to put his interest in the DCJV in trust. Tauber agreed. Although Wolff was not a member of the newly created Consolidated Partnership and did not sign the Consolidated Partnership agreement, that agreement contained an arbitration clause providing that "any dispute or controversy that cannot amicably be settled shall be submitted to binding arbitration." Defs.' Mem. at 4.

Tauber later reorganized the Consolidated Partnership into several LLCs[2] in order to limit the liability of the partnership interests and, in 1999, the Transpoint building and the adjacent lot were transferred to the Laszlo N. Tauber & Associates I, LLC ("Tauber I") subsidiary. The parties dispute whether Tauber I was owned and controlled by the LNT&A Master LLC, the master entity which wholly owned a number of subsidiary LLCs, which in turn owned a number of the properties previously held by the Consolidated Partnership. Although the original LNT&A Master LLC operating agreement has not been provided to the court, a March 3, 2006 amendment to the LNT&A Master LLC operating agreement also contains an arbitration clause. *See* Defs.' Ex. 3 ("LNT&A Master Agreement") § 9.8(a). Wolff was not a member of the LNT&A Master LLC. Pls.' Opp'n at 22–23.

In 2002, Tauber died and, pursuant to the 1984 Tauber Letter, management and control of

---

[2] An LLC is a corporate entity that provides many of the benefits of both corporations and partnerships. Specifically, an LLC provides limited personal liability to its members but operates in much the same way as a traditional partnership (whose members do not generally enjoy limited liability). *See generally* Md. Code Ann., Corps. & Ass'ns § 4A-101 *et seq.* Each of the relevant LLCs to this case is a Maryland LLC, organized pursuant to Maryland's Limited Liability Company Act. *See id.*

the ventures that had been transferred into the Consolidated Partnership was vested with Westwood Management LLC.  In February 2004, Westwood sold the Transpoint building and the adjacent lot and distributed payment to the investors according to their respective classes.  On July 10, 2006, Wolff filed a complaint alleging breach of fiduciary duty and derivative claims, all resulting from the management and sale of the Transpoint building and the adjacent lot.  He alleges that defendants used funds from various mortgages and refinances of the Transpoint building and the adjacent lot for purposes other than for use by and for the Transpoint building and the adjacent lot; specifically, to make improvements to other properties and for defendants' enrichment.  Defendants have moved to compel arbitration, asserting that Wolff is bound by the arbitration clause in the DCJV agreement as well as the arbitration clauses in the subsequent agreements.

## II.  ANALYSIS

### A.     Standard Of Review

When a party opposing arbitration contends that no agreement to arbitrate was entered, she effectively raises the issue of whether there was a meeting of the minds on the agreement to arbitrate, and the standards for resolving a summary judgment motion pursuant to Federal Rule of Civil Procedure 56 are therefore applied.  *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 99 (D.D.C. 2004); *Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 67 (D.D.C. 2003) ("[T]he proper approach to employ in reviewing the defendant's motion to dismiss and compel arbitration is to apply the same standard of review that governs Rule 56 motions." ); *see also Stromberg Sheet Metal Works, Inc. v. Washington Gas Energy Sys.*, Inc. 448 F. Supp. 2d 64, 68 (D.D.C. 2006).  It is appropriate to grant a party's motion to compel arbitration when the

pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking to compel arbitration bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether there is a genuine issue of material fact sufficient to preclude summary judgment, the non-movant's statements should be accepted as true and all inferences should be drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).[3]

### B.     The FAA

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving interstate commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The question of whether a particular dispute is arbitrable is "undeniably an issue for judicial determination."

---

[3] Wolff argues that defendants' failure to include a statement of undisputed material facts with their motion as required by LCvR 7(h) "calls for an outright denial and dismissal of [the] motion." Pls.' Opp'n at 13. In support of his argument, Wolff cites *Argueta v. District of Columbia*, 355 F. Supp. 2d 408 (D.D.C. 2005), asserting that the court dismissed the defendant's motion for summary judgment for failure to submit a statement of undisputed material facts. Wolff misstates the case. In *Argueta*, the court granted the plaintiff's motion for summary judgment after it deemed the defendant to have admitted the facts identified by the plaintiff in its motion for summary judgment because the defendant failed to comply with LCvR 56.1 (which is identical to LCvR 7(h)). *See id.* at 413–14. In this case, defendants' brief in support of their motion to compel arbitration includes a background section which sets forth a statement of facts based on Wolff's complaint. *See* Defs.' Mem. at 2 & n.1.

*AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (citations omitted). The basis for judicial authority to make this determination lies in the fact that arbitration agreements are separable from the agreements in which they are incorporated. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006). Thus, it is well settled that a court may dismiss an action altogether where "all issues raised in the complaint must be submitted to arbitration." *Emeronye v. CACI Int'l, Inc.*, 141 F. Supp. 2d 82, 88 (D.D.C. 2001).

A strong policy favoring alternative means of dispute resolution through arbitration supports a presumption of arbitrability. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Buckeye Check Cashing*, 546 U.S. at 440. However, "the FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989) (citation omitted). Indeed, the overriding purpose of the FAA is not judicial economy or the expeditious resolution of claims, but the enforcement of agreements into which parties have entered. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985). As articulated by the Supreme Court, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648.

Relying on the language of the FAA, which states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, federal courts have applied "ordinary state-law principles that govern the formation of contracts" when determining arbitrability, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Thus, while mindful of the federal policy

favoring arbitration, it is the court's task to determine the parties' intent. *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 760–61 (D.C. Cir. 1988). In determining whether arbitration should be compelled, the court must analyze the arbitration agreement under the FAA and applicable state law to determine (1) whether the parties entered into a valid and enforceable arbitration agreement, and (2) whether the arbitration agreement encompasses the claims raised in the complaint. *Hughes v. CACI, Inc.*, 384 F. Supp. 2d 89, 95 (D.D.C. 2005) (citing *Nelson v. Insignia/ESG, Inc.*, 215 F. Supp. 2d 143, 149–50 (D.D.C. 2002)).

        1.      **The Parties Entered Into A Valid And Enforceable Arbitration Agreement**

There can be no dispute that, at least at the time they executed the DCJV Agreement, the parties entered into a binding arbitration agreement. Wolff's father signed the DCJV Agreement, which contained an arbitration clause, and "a signature on a contract indicates mutuality of assent and a party is bound by the contract unless he or she can show specific circumstances relieving him or her of such an obligation." *Emeronye*, 141 F. Supp. 2d at 86 (citations and internal quotation marks omitted). Wolff argues, however, that the agreement to arbitrate manifested in the DCJV Agreement does not apply to this controversy for two reasons. First, he asserts that defendants rely on the FAA as the sole source for the motion to compel arbitration, but in order for the FAA to apply the controversy must affect interstate commerce and defendants have neither claimed nor demonstrated that the DCJV Agreement involves interstate commerce. Pls.' Opp'n at 11, 14–15. Second, he maintains that the arbitration agreement was extinguished upon creation of the Consolidated Partnership. *Id.* at 25–26. The court will address these arguments in turn.

In *Allied-Bruce Terminix Companies v. Dobson*, the Supreme Court addressed the disagreement in the state and federal courts surrounding the meaning of the FAA's words "involving commerce." 513 U.S. 265, 268–70 (1995). The Court held that "involving" is the functional equivalent of "affecting," and therefore Congress intended to exercise the full extent of its commerce powers when it enacted the FAA. *Id.* at 273–74. The full extent of Congress's commerce power is exemplified in *Wickard v. Filburn*, in which the Supreme Court held that even intrastate activities of a very small scale could be federally regulated if they might affect commerce when combined with similar small-scale activities. *See* 317 U.S. 111, 127–28 (1942); *see also Gonzales v. Raich*, 545 U.S. 1, 19–22 (2005).

Here, Wolff argues that defendants have not shown that the DCJV Agreement involves interstate commerce. Pls.' Opp'n at 14. The court, however, has no trouble concluding that the investment in a multi-million dollar office building located in the District of Columbia while owned by entities in Maryland involves interstate commerce. *See* Compl. ¶¶ 1, 4, 28. The fact that Wolff owned only a small share of the venture (0.5% in the land and 0.25% in the building) is of no consequence when viewed under the lens of *Wickard* and its progeny.

Wolff further asserts that the arbitration agreement does not apply to this controversy because it was extinguished by the creation of the Consolidated Partnership. Wolff maintains that he is beyond the reach of the DCJV Agreement, yet that he is not bound by the arbitration clause contained in the Consolidated Partnership agreement because he did not consent to be governed by any partnership agreements subsequent to the DCJV Agreement. *See* Pls.' Opp'n at 20–22. The court is not persuaded.

It is well settled that an arbitration clause is enforceable after the expiration of a contract when the dispute is over an obligation created by the expired contract. *See Montgomery Mailers' Union No. 127 v. Advertiser Co.*, 827 F.2d 709, 712 (11th Cir. 1987) (citing *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 252 (1977)). As reasoned by the Supreme Court, an arbitration agreement may survive the expiration of a contract because it is a "structural provision" that relates to remedies and dispute resolution, and not an obligation concerning performance. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 208 & n.3 (1991) (citations omitted); *see also Nolde*, 430 U.S. at 250–51 (holding that the termination of a collective-bargaining agreement does not automatically extinguish a party's duty to arbitrate grievances arising under the contract because "[c]arried to its logical conclusion that argument would preclude the entry of a post-contract arbitration order even when the dispute arose during the life of the contract but arbitration proceedings had not begun before termination").

The obligations at issue in this case can only have arisen from the DCJV Agreement because there was no other agreement with defendants that Wolff entered into. Thus, even if the DCJV Agreement terminated upon creation of the Consolidated Partnership, the court concludes that the agreement to arbitrate manifested in the DCJV Agreement survives termination of the DCJV Agreement and that it applies to this controversy.

    **2.    The Arbitration Agreement Encompasses The Claims Raised In The Complaint**

Having concluded that an arbitration agreement exists, the court must next examine the scope of the arbitration agreement and determine whether it covers all of the claims raised in Wolff's complaint. The arbitration provision in the DCJV Agreement provides that "[t]he parties

agree not to enter into any court action in any dispute which may arise during construction and management of the office building complex and agree that any dispute or controversy that cannot be amicably settled will be submitted to arbitration . . . ." DCJV Agreement ¶ 15. As is often the case in contract disputes, the parties disagree regarding the proper interpretation of this language. Wolff focuses on the first part of the arbitration clause and argues that the terms of the DCJV Agreement's arbitration provision "expressly exclude the dispute at issue" because the agreement restricts the duty to arbitrate to those disputes "which may arise during construction and management of the office building complex." Pls.' Opp'n at 17. Conversely, defendants rely on the second part of the arbitration clause and assert that the agreement to arbitrate applies to "any disputes," not just those arising during construction and management of the office building complex. Defs.' Mem. at 7. Defendants further insist, however, that even if the arbitration provision is read narrowly to include only those disputes that arise during construction and management, the dispute at issue is encompassed in "management" of the office building complex, because "management . . . would have to include financing and disposition of the property." *Id.* at 8.

At the center of this dispute is the question of whether the arbitration clause is broad or narrow — that is, whether the phrase "any dispute or controversy" broadly encompasses any dispute arising under the contract, or if it instead modifies the part of the arbitration clause specifically referring to disputes which arise during construction and management. It is unnecessary for the court to dwell on this question, however, because both paths of interpretation lead to the same result.

Where an arbitration clause is broad, arbitration is appropriate "whenever a party has asserted a claim, however frivolous, that on its face is governed by the contract." *Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union, Local One*, 903 F.2d 924, 927 (2d Cir. 1990) (citations omitted). The Supreme Court has indicated that broad arbitration clauses encompass all matters that "touch" upon the contract. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985).[4] A narrow arbitration clause, however, covers "only specified types of disputes," *Nat'l R.R. Passenger Corp.*, 850 F.2d at 762, and the court must "consider whether the conduct in issue is on its face within the purview of the clause." *Rochdale Village, Inc. v. Pub. Serv. Employees Union*, 605 F.2d 1290, 1295 (2d Cir. 1979).

In deciding whether the counts of Wolff's complaint are subject to arbitration, the court must bear in mind that "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960); *see also Dowley v. Dewey Ballantine, LLP*, 2006 WL 1102768, *8 (D.D.C. Apr. 26, 2006) ("[U]nless the language excluding certain disputes from arbitration is clear and unambiguous, arbitration should be ordered.").

---

[4] While very expansive language will generally indicate a broad arbitration clause, *see, e.g.*, *Prima Paint*, 388 U.S. at 398 ("any controversy or claim arising out of or related to" this agreement), several circuits have deemed arbitration clauses broad when examining more limited language, *see Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) ("[a]ny dispute arising from the making, performance or termination"); *Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 385–86 (11th Cir. 1996) ("any dispute between any of the Parties which may arise hereunder"); *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993) ("[a]ny disputes arising out of the agreement").

Here, if the arbitration clause provided in the DCJV Agreement is read broadly, it is clear that Wolff's allegations of breach of fiduciary duty and derivative claims touch upon the contract. The contract was the basis of Wolff's relationship with defendants and this dispute arose directly from defendants alleged breach of fiduciary duties owed pursuant to the contract. Additionally, if the arbitration clause is read narrowly, Wolff's allegations of breach of fiduciary duty and derivative claims are within the scope of the arbitration clause because the clause provides that "any dispute which may arise during construction and management of the office building complex . . . will be submitted to arbitration." DCJV Agreement ¶ 15. Wolff maintains that this language "demonstrates that the agreement to arbitrate pertains not to disputes that arise *from* the [DCJV] agreement or from [] Tauber's management of the Transpoint building, but instead only *temporally* with [] the construction and [] management of the Transpoint building." Pls.' Opp'n at 15 (emphasis in original). Wolff appears to assert that "management" is limited to the time in which the DCJV controlled the Transpoint building, and therefore, because the transactions giving rise to defendants' liability for the financial management of DCJV's former assets did not occur until after the creation of the Consolidated Partnership, they lie outside the arbitration agreement. *See id.* at 17. The court, however, sees no reason to construe the arbitration clause as applying only temporally to management under the DCJV Agreement. The parties could have expressly limited the reach of the agreement but did not. *See John Wiley & Sons v. Livingston*, 376 U.S. 543, 555 (1964). Moreover, when viewed in light of the presumption in favor of coverage, the parties' intent appears to be to include both disputes that arose during and after construction, s*ee United Steelworkers*, 363 U.S. at 582-83; DCJV Agreement ¶ 15, not for the

arbitration agreement to apply to construction and management of the Transpoint building only so long as the DCJV Agreement was in effect and unmodified.

The claims raised in Wolff's complaint are thus within the scope of the arbitration clause. As defendants correctly point out, "management" of the Transpoint building "would have to include financing and disposition of the property." Defs.' Mem. at 8.  Accordingly, the court concludes that, whether the arbitration clause is read broadly or narrowly, it encompasses the claims raised in Wolff's complaint.

### 3. Equitable Principles Do Not Estop Defendants From Invoking The Arbitration Agreement

Wolff further argues that, should the court find that the arbitration agreement applies to this dispute, the doctrine of unclean hands prevents defendants from invoking the arbitration agreement while, at the same time, denying Wolff the rights he had under the DCJV.  Pls.' Opp'n at 19.  According to Wolff, defendants' actions include "concealing the continued existence of the DCJV between 1985 and 1999; and [] denying [] plaintiffs the ability to review the records of financial transactions made after 1985."  *Id.*

It is well settled that under the FAA, a district court's consideration of a motion to compel arbitration is limited to determining whether the parties entered into a valid agreement to arbitrate, and does not reach the merits of the parties' claims.  *See Nelson*, 215 F. Supp. 2d at 146; *Nur v. K.F.C. U.S.A., Inc.*, 142 F. Supp. 2d 48, 50–51 (D.D.C. 2001).  The doctrine of unclean hands "does not stand as a defense that may be properly considered independent of the merits of the plaintiff's claim."  *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 350 (9th Cir. 1963).

Wolff attempts to analogize the doctrine of unclean hands with fraud in the inducement and cites *Prima Paint* for the proposition that "[t]o immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract — a situation inconsistent with the 'saving clause' [in § 2 of the FAA]." Pls.' Opp'n at 18 (citing *Prima Paint*, 388 U.S. at 404 n.12). The court, however, fails to see the parallel between fraud in the inducement and the doctrine of unclean hands. Fraud in the inducement necessarily precedes the mutual assent of the parties, while the doctrine of unclean hands does not. Moreover, in *Prima Paint*, the Court held that a claim of fraud in the inducement must implicate the making of the arbitration clause itself in order for a district court to proceed to adjudicate it, and that a claim of fraud in the inducement with respect to a contract as a whole is beyond the consideration of a district court evaluating a motion to compel arbitration. 388 U.S. at 403–04. This court finds no reason to conclude that Wolff's unclean hands argument implicates the making of the arbitration agreement in any way and, therefore, rejects the argument that equitable principles estop defendants from invoking the arbitration agreement.[5]

---

[5] Wolff also relies on *E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates* for the proposition that "[t]o allow a plaintiff to claim the benefit of a contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act." Pls.' Opp'n at 20 (quoting 269 F.3d 187, 200 (3d Cir. 2001)). *Dupont*, however, addressed the question of whether a non-signatory can avoid arbitration when it has maintained that other provisions of the same contract should be enforced to its benefit. *See* 269 F.3d at 200–02. That issue is not before this court. Defendants do not maintain that any part of the DCJV Agreement does not apply to them. Rather, it is Wolff's assertion that defendants denied him rights that he was owed under the DCJV Agreement.

## III.  CONCLUSION

For the foregoing reasons, the court concludes that defendants' motion to compel arbitration must be granted.  An appropriate order accompanies this memorandum opinion.


                                                          Henry H. Kennedy, Jr.
                                                          United States District Judge

Dated: August 27, 2007